UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——————

|  |  |  |
|---|---|---|
| STEPHANIE GALLANT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:13-cv-688 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security denying plaintiff's claims for disability insurance benefits (DIB) and supplemental security income (SSI) benefits.  On October 14, 2009, plaintiff filed her applications for DIB and SSI benefits, alleging a June 1, 2006, onset of disability.[1]  (A.R. 139-48).  She later amended her claims to allege a May 1, 2008, onset of disability.  (A.R. 42, 45, 172).  Her claims were denied on initial review.  On December 16, 2011, she received a hearing before an administrative law judge (ALJ), at which she was represented by counsel.  (A.R. 34-81).  On December 29, 2011, the ALJ issued a decision finding that plaintiff was not disabled.  (A.R. 20-29).  On May 16, 2013, the Appeals Council denied review (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

_____

[1]SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335;  *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004).  The earliest month in which SSI benefits are payable is the month after the application for SSI benefits is filed.  Thus, November 2009 is plaintiff's earliest possible entitlement to SSI benefits.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision denying her claims for DIB and SSI benefits.   She asks the court to overturn the Commissioner's decision on the following grounds:

1.    The ALJ violated "regulations for the assessment of pain, particularly by ignoring the sedating side effects of pain medications[;]" and

2.    The ALJ violated "regulations for the assessment of treating source opinions."

(Statement of Errors, Plf. Brief at 1, docket # 14; *see also* Reply Brief at 2, 5, docket # 16).[2]  I recommend that the Commissioner's decision be affirmed in part and vacated in part.  I recommend that the portion of the ALJ's decision finding that plaintiff was not disabled through August 22, 2009, be affirmed.  I recommend that the portion of the ALJ's decision finding that plaintiff was not disabled during the period from August 23, 2009, through December 29, 2011, be vacated, and that the vacated portion be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.   Plaintiff presented evidence that she began receiving the narcotic medication methadone on August 23, 2009, and she testified that she suffered from disabling side effects from that medication.  Dr. Fitzgerald, a treating physician, offered a statement supporting plaintiff's claim that she suffered disabling side effects from methadone.  The portion of the ALJ's opinion for the period on and after August 23, 2009, should be overturned because the ALJ's opinion failed to analyze the credibility of plaintiff's testimony claiming that she experienced disabling side effects from methadone and failed to provide "good reasons" why he rejected Dr. Fitzgerald's opinion that plaintiff suffered severe side effects from methadone, such that she would

---

[2]Plaintiff's attorney is reminded that reply briefs are not to exceed five pages.  (*see* docket # 10).

require a restriction against working in close proximity to workplace hazards such as dangerous moving machinery.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see*

*Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013) ("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from May 1, 2008, through the date of the ALJ's decision. (A.R. 22). Plaintiff had not engaged in substantial gainful activity on or after May 1, 2008. (A.R. 22). Plaintiff had the following severe impairments: "degenerative disc disease of the lumbosacral spine with no evidence of radiculopathy." (A.R. 22). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 23). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently. She is able to sit for up to 6 hours total in an 8-hour workday. She is able to stand and walk for up to 6 hours total in an 8-hour workday. The claimant is able to climb ramps and stairs frequently. She is unable to climb ladders, ropes, or scaffolds. She is able to stoop, kneel, crouch, and crawl occasionally. The claimant is able to frequently balance. She must avoid concentrated exposure to extreme cold, fumes, odors, dust, gasses, and areas of poor ventilation.

(A.R. 23-24). The ALJ found that plaintiff's testimony regarding her subjective functional limitations was not fully credible. (A.R. 24-27). The ALJ found that plaintiff was unable to perform

any past relevant work.  (A.R. 27).  Plaintiff was 30-years- old as of her alleged onset of disability and 35-years-old as of the date of the ALJ's decision.  Thus, at all times relevant to her claims for DIB and SSI benefits, plaintiff was classified as a younger individual.  (A.R. 27).  Plaintiff has at least a high-school education and is able to communicate in English.  (A.R. 27).  The transferability of job skills was not material to a disability determination.  (A.R. 27).  The ALJ then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 20,400 jobs in Michigan's Lower Peninsula that the hypothetical person would be capable of performing.  (A.R. 75-77).  The ALJ found that this constituted a significant number of jobs.  Using Rule 202.21 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled.  (A.R. 28).

## 1.

Plaintiff argues that the ALJ committed reversible error when he failed to give appropriate weight to the opinions of a treating physician, Kevin Fitzgerald, M.D.  (Plf. Brief at 21-25; Reply Brief at 5-7).  The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(1) 416.927(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  A treating physician's opinion that a patient is disabled is not entitled to any special significance.  *See* 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the

Commissioner, not the treating physician.").  Likewise, "no special significance"[3] is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

       Generally, the medical opinions of treating physicians are given substantial, if not controlling deference.  *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011).  "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician.  Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'"  *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)).  A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).  An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight.  *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see*

---

[3]"We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section."  20 C.F.R. §§ 404.1527(d)(3), 416.937(d)(3).

*also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. §§ 404.1527(c), 416.927(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

Andrew Jameson,[4] M.D., Benjamin Bruinsma, M.D., and Kevin Fitzgerald, M.D., were plaintiff's treating physicians during the relevant time period from May 1, 2008, plaintiff's amended onset of disability date, through December 29, 2011, the date of the ALJ's decision. Doctors Jameson and Bruinsma treated plaintiff during the period before she filed her applications

---

[4]Dr. Jameson's name appears as "Jamieson" throughout plaintiff's brief. The spelling utilized herein is based on the spelling of the doctor's last name as it appears in his progress notes.

for SSI and DIB benefits.  Dr. Fitzgerald began treating plaintiff in October 2009, the month plaintiff

filed her applications for benefits.  (A.R. 26).

Plaintiff began treatment with Dr. Jameson at Wege Institute Internal Medicine in

November 2007.  Plaintiff recently had twins.  She related that her back pain began "about a year

and one-half [earlier] during her pregnancy . . . with twins."  (A.R. 254).  Plaintiff was described as

"mildly obese."  She weighed 253 pounds and was 5 feet, 8 inches tall.  She related that she smoked

a pack of cigarettes per day and had done so for quite some time.  "She expressed no desire to quit

at this time."  (A.R. 254).  Plaintiff reported mild to moderate tenderness just above her sacroiliac

joint.  Her gait, flexion, and extension were all normal.  Her extremities displayed no cyanosis,

clubbing, or edema.  Dr. Jameson observed: "no weakness noted anywhere."  The MRI of plaintiff's

spine returned normal results.  Her sacroiliac joints appeared normal.  Dr. Jameson offered a

diagnosis of back pain of unknown etiology, gave plaintiff prescriptions for Naproxen and Ultram,

and referred her to physical therapy.  (A.R. 296-97).

In January, 2008, Dr. Jameson noted that plaintiff was "finishing up her physical

therapy."  She continued to complain of increased back pain "secondary to pregnancy and dealing

with kids."  (A.R. 295).  She had no weakness or focal neural deficits.  Her reflexes were

symmetrical.  Her flexion and extension were limited on the left side.  Dr. Jameson changed

plaintiff's nonsteroidal anti-inflammatory drug (NSAID) to Relafen and gave her a prescription for

the muscle relaxant Flexeril.  (A.R. 295).  In May 2008, Dr. Jameson noted that plaintiff's MRI

"showed no cord impingement or disc bulge."  Plaintiff reported that NSAIDs and muscle relaxants

were "slowly helping but not making any huge difference."  Dr. Jameson counseled plaintiff at great

length about her need to lose weight and to discontinue her consumption of high sugar pop and

potato chips.  (A.R. 293).  In September 2008, plaintiff's weight  was down to 245 pounds.  Dr. Jameson noted that continued weight loss was "really going to be the only thing in the long term that will be beneficial for her."  (A.R. 291).  On September 8, 2008, Dr. Jameson referred plaintiff to Dr. Bruinsma at Rehabilitation and Physical Medicine Specialists, P.C.  (A.R. 336-37).

"Dr. Bruinsma treated the claimant for back pain during 2008 and 2009."  (A.R. 25).  On September 23, 2008, plaintiff gave Dr. Bruinsma a summary of the treatment that she had received for her back pain.  (A.R. 267).  Plaintiff reported to Dr. Bruinsma that she had decreased her cigarette use from one pack per day down to one-half pack per day.  Plaintiff went bowling once a week and provided care for her twins, now age two.  Her hobbies included puzzles and reading.  (A.R. 267).  Dr. Bruinsma found that plaintiff was in no apparent distress.  Her gait was stable and she was able to toe-walk and heel-walk.  Her straight leg raising tests were negative bilaterally.  Her strength was 5/5 and resisted strength testing was pain free.  Plaintiff retained a functional range of motion with left low back discomfort on extension, left lateral bending, and right rotation.  Dr. Bruinsma offered a diagnosis of mechanical low back pain with no evidence of radiculopathy and obesity.  He gave plaintiff a home exercise program and a prescription for Celebrex.  (A.R. 268).  Dr. Bruinsma sent a letter to plaintiff's physician, Bryan E. Hull at St. Mary's Internal Medicine,[5] advising Dr. Hull of the findings, treatment, and recommendations.  (A.R. 330-31).

On October 17, 2008, Dr. Bruinsma found that plaintiff was in no apparent distress.  Her gait was stable and she was able to toe-walk and heel-walk.  Straight leg raising tests were negative and her strength was 5/5 in her lower extremities.  Dr. Bruinsma's diagnosis of mechanical

---

[5]Although the administrative record contains hospital records from St. Mary's Health Care (A.R. 344-63), the parties have not provided the court with any explanation why Dr. Hull's treatment records from St. Mary's Internal Medicine do not appear in the record.

low back pain remained unchanged.  He did not believe that treatment with facet injections was

necessary.  (A.R. 266).  On October 21, 2008, Dr. Bruinsma found that plaintiff was not in any

apparent distress.  "Strength in the lower extremities was 5/5.  Resisted strength testing was pain

free.  Sensation was symmetric and intact.  Straight leg raising was negative.  FABER tests were

negative.[6]  Lumbar range was full.  She had discomfort with flexion in the left low back region, and

extension with rotation was pain free.  With palpation she had discomfort of the iliac crest region,

which mimicked her discomfort."  (A.R. 265).  After explaining the risks and alternatives, he treated

plaintiff with an injection to the iliac crest region.  (A.R. 265).  On November 6, 2008, plaintiff

reported to Dr. Bruinsma that the injection treatment had only provided temporary pain relief.  Dr.

Bruinsma gave plaintiff a Celebrex prescription and advised her to perform stretching exercises

twice a day.  (A.R. 264).

On November 10, 2008, plaintiff returned to Dr. Jameson.  Plaintiff indicated that she

was doing a little better.  Her weight was down to 235 pounds after she switched to diet pop.

Plaintiff was advised to continue physical therapy and stretching exercises.  (A.R. 289).

On December 5, 2008, plaintiff reported to Dr. Bruinsma that she was not

experiencing any side effects from taking Celebrex.  She had no lower extremity discomfort, sensory

changes or weakness.  Her gait was stable and her strength was 5/5.  Dr. Bruinsma gave plaintiff a

second injection.  (A.R. 263).  On January 16, 2009, plaintiff informed Dr. Bruinsma that she felt

---

[6]FABER stands for flexion, abduction, and external rotation.  *Davenport v. Commissioner*, No. 3:12-cv-44, 2012 WL 6738668, at * 4 n.2 (S.D. Ohio Dec. 31, 2012).  A FABER test is "used to detect problems in the sacroiliac joint[.]"  *Al-Khalili v. Astrue*, No. 3:12-cv-347, 2013 WL 4500326, at * 3 n.18 (M.D. Tenn. Aug. 20, 2013); *see Mullins v. Prudential Ins. Co. of Am.*, No. 3:09-cv-371, 2011 WL 2295265, at * 2 n.3 (W.D. Ky. June 8, 2011) ("A Faber test, also known as a Patrick test, is used to determine the presence or absence of sacroiliac disease[.]").

"significantly better." After the second injection, her pain never returned to pre-injection level. Plaintiff stated that the only time she experienced discomfort was when she performed repetitive or continuous flexion. Dr. Bruinsma advised plaintiff to continue her stretching exercises and to take Celebrex for two more weeks. (A.R. 262). On February 10, 2009, plaintiff reported that she had injured her back while getting out of her truck. She stated that there was an important bowling tournament coming up in a few weeks and she wanted to participate in it. Dr. Bruinsma gave plaintiff a prescription for Celebrex. (A.R. 261). On February 17, 2009, plaintiff stated that she had experienced minimal improvement with Celebrex. She reported that her back had improved, but she had pain in the "medial back/upper buttock region," primarily aggravated with flexion. Plaintiff denied lower extremity pain, sensory changes, or weakness. Dr. Bruinsma made the following observations:

> Physical Examination: Ms. Gallant was independent with sit to stand. She ambulated in the hallway with a stable gait. Lower extremity strength was 5/5. Straight leg raising was negative. FABER's were minimally positive on the left, but much improved from last visit. Right FABER's was negative. . . . Lumbar range was full. She had discomfort with flexion, extension, and left lateral bending felt in the medial buttock region. With palpation the discomfort over the SI joint was significantly improved. She did have discomfort over the superior SI joint and crest region.

(A.R. 260). Dr. Bruinsma treated plaintiff with a third injection and she "tolerated the procedure well." (A.R. 260). On March 3, 2009, plaintiff reported that she had been able to bowl three games on Saturday and on Sunday. Into her fifth game she started noticing some discomfort. Dr. Bruinsma's diagnosis was mechanical low back pain and resolved sacroiliitis. (A.R. 276). On March 23, 2009, plaintiff reported to Dr. Jameson that she was feeling better as she continued to lose weight. Plaintiff continued to use about one Vicodin per day prior to exercising. (A.R. 288).

On June 2, 2009, plaintiff returned to Dr. Bruinsma after a three-month absence. (A.R. 322). Plaintiff reported that she had been doing "fairly well" until about two months earlier when her pain returned. She conceded that she had stopped performing her home exercise program. She indicated that the pain was in an area about the size of a silver dollar in her lower back. She reported that Vicodin had provided pain relief. Dr. Bruinsma's progress notes recorded that plaintiff's medications were "Vicodin two tablets per day [and] Flexeril q.h.s." (A.R. 322). No side effects were noted for either medication. Plaintiff's gait remained stable and her strength was 5/5. Her straight leg raising and FABER tests were negative. Plaintiff retained a functional range of motion in her lumbar spine. She reported discomfort in the left low back with flexion and right lateral bending. Dr. Bruinsma offered a diagnosis of mechanical low back pain and mild sacroiliitis. (A.R. 322). Dr. Bruinsma gave plaintiff a prescription for Lodine and instructed plaintiff to return to her home exercise program. (A.R. 323).

On June 10, 2009, plaintiff appeared at the emergency department at St. Mary's Hospital. She reported left-sided abdominal pain and vomiting. She stated that earlier in the evening she had vomited what appeared to be some bloody emesis. Her test results were unremarkable. Her physical and neurological examinations were normal. In addition, she did not have any episodes of bloody emesis in the emergency department. (A.R. 333-34). Doctors at St. Mary's started plaintiff on Nexium and advised her to avoid NSAIDs. (A.R. 349). On June 19, 2009, Dr. Bruinsma gave plaintiff another injection. (A.R. 272). On July 8, 2009, plaintiff's endoscopy revealed "no evidence of NSAIDs induced peptic ulcer disease." (A.R. 300).

On July 9, 2009, Dr. Bruinsma noted that plaintiff reported no improvement when treated with anti-inflammatories and only temporary relief through injections. Plaintiff indicated

that she was discussing the use of longer acting narcotics with her primary care physician. Dr. Bruinsma's progress notes indicate that he gave plaintiff Norco. (A.R. 271). When plaintiff returned on July 21, 2009, she reported no side effects from this medication. (A.R. 270).

It appears that Dr. Jameson approved a prescription for Methadone sometime in August 2009. On June 29, 2009, he indicated that he would proceed with narcotic pain medication if a trial of Prednisone was not successful. (A.R. 285). The next progress note from Dr. Jameson is dated August 24, 2009. (A.R. 283). This progress note states: "She started methadone 5 mg b.i.d and says she has only been needing one Norco a day about, and that is in the middle of the day to help her out. She continues to lose weight and has dropped another ten pounds in the last two months. She is down to 220 pounds, down from around 270. She feels a little better about this and can move around better." Jameson instructed plaintiff to continue with her current regimen of increased activity as well as keeping away from sugar and pop. He stated, "we will up the dose of Methadone to 5 m.g. t.i.d., and hopefully this will make a difference for her." (A.R. 283). The records from Dr. Jameson's office do not record any complaint by plaintiff regarding side effects from taking Methadone, including drowsiness.

The ALJ noted that the June 30, 2009, MRI of plaintiff's lumbar spine "showed minimal subluxation at L3-4, very minor degenerative changes, a mild posterior disc bulge at L5-S1, which did not result in significant spinal canal stenosis or neural foraminal stenosis." (A.R. 25; *see* A.R. 306-07). X-rays of plaintiff's lumbar spine showed very mild degenerative changes. (A.R. 25; *see* A.R. 305). "A bone scan of the lumbar spine revealed minimally increased activity in the area of the right sacroiliac joint, which was thought to be related to pseudoarthrosis between the transverse process of the L5 and sacrum." (A.R. 25; *see* A.R. 303).

-13-

On October 7, 2009, plaintiff was treated by J. Bhunpaen, M.D. Plaintiff complained of cough, chest tightness and fever. Plaintiff received counseling to stop smoking cigarettes. (A.R. 281).

On October 15, 2009, plaintiff began treating with Dr. Fitzgerald at Michigan Pain Consultants, P.C. (MPC). (A.R. 368). On that date, plaintiff reported that she continued to smoke one-half pack of cigarettes per day. She advised Dr. Fitzgerald that she was a stay at home mom and that she liked to go bowling. (A.R. 368). Plaintiff reported that she was taking Vicodin tablets three times and methadone three times a day for pain relief. She did not report any side effects from this medication. (A.R. 368). Dr. Fitzgerald found that plaintiff was in no acute distress. He found no evidence of any gross motor or sensory deficit, atrophy or fasciculation. (A.R. 368). Dr. Fitzgerald offered a diagnosis or sacroiliac joint pain and began treating plaintiff with sacroiliac joint injections. (A.R. 369, 382-85, 389-92). On July 26, 2010, plaintiff reported frustration with repeated injection therapy because she was "trying to take care of her children and she is a busy stay-at-home mom." (A.R. 382). There are no medical records from Dr. Fitzgerald's office establishing that he prescribed medication for plaintiff.[7] None of his records document any complaint that plaintiff

---

[7]Dr. Fitzgerald's progress note dated May 3, 2010, states: "[S]he has asked about me taking over her oral pain meds. I do not have a problem with this. She will discuss it with her primary care doctor." (A.R. 383). The records that plaintiff filed fail to establish with certainty whether Dr. Fitzgerald took over the duty of prescribing her oral pain medications. Fitzgerald's subsequent statement that other physicians prescribed methadone for plaintiff suggests that he did not prescribe plaintiff's pain medications. (A.R. 402). None of the treatment records from Dr. Fitzgerald's office recorded any complaint that plaintiff suffered any side effects form her medications.

When plaintiff was questioned at the hearing about whether she had ever talked to her doctor about experiencing drowsiness, her response was that she thought that she had mentioned it to one of Dr. Fitzgerald's physician's assistants in early December 2011. (A.R. 64). There are no records from MPC dated December 2011. Further, Dr. Fitzgerald's RFC questionnaire dated December 12, 2011, indicated that plaintiff's most recent treatment had been on September 26, 2011. (A.R. 402).

suffered from side effects from any medication.  In 2011, plaintiff regained all the weight that she had lost and was back in the neighborhood of 270 pounds.  (A.R. 394-96).

The MRI of plaintiff's lumbar spine on April 15, 2011, showed "minor degenerative disc changes at L3-4 and L4-5."  There was no focal disc protrusion, canal stenosis, or nerve root compression.  (A.R. 398). The x-rays of plaintiff's lumbosacral spine were normal.  (A.R. 397).

It was against this backdrop that the ALJ considered the RFC questionnaire that Dr. Fitzgerald signed on December 12, 2011.  (A.R. 399-400).  He offered an opinion that plaintiff was restricted to frequently lifting and carrying up to 5 pounds and occasionally lifting and carrying up to 10 pounds based on plaintiff's MRI which showed only "mild" degenerative changes.  (*Id.*). Fitzgerald had no treatment relationship with plaintiff before October 15, 2009.  Nonetheless, in response to a question regarding the date plaintiff "was first limited in these activities," Dr. Fitzgerald responded as follows: First treatment 10/15/09, but by report at least 3/08."  Dr. Fitzgerald stated:  "The patient takes Methadone which causes drowsiness.  She needs to avoid workplace hazards."  (A.R. 401).  The ALJ's opinion simply noted Dr. Fitzgerald's opinion that plaintiff was taking methadone which causes drowsiness, and that she needed to avoid work hazards while taking this medication:

> Dr. Fitzgerald, the claimant's primary care physician, completed a residual functional capacity assessment for the claimant (11F).  He opined that the claimant is limited in her ability to lift and carry weight in excess of 10 pounds, and perform postural activities.  He noted that the claimant's methadone medication makes her drowsy and she needs to avoid work hazards (11F/3).  The undersigned finds that Dr. Fitzgerald's opinion is inconsistent with the objective medical evidence.  Dr. Fitzgerald has essentially opined that the claimant is restricted to a less than sedentary range of exertional activity.  However, as noted above, the objective medical evidence does not show any significant limitations regarding the claimant's spine.  There is no indication in the evidence that the claimant is unable to work at a restricted range of light work.  The undersigned assigns little weight to Dr. Fitzgerald's opinion.

(A.R. 26).   I find no violation of the treating physician rule for any period before plaintiff began taking methadone.   The ALJ's opinion fell short of providing "good reasons" for rejecting Dr. Fitzgerald's opinion regarding methadone-induced drowsiness for the period after plaintiff began taking methadone.   The ALJ could have easily rejected this opinion on numerous grounds, including that Dr. Fitzgerald did not identify any treatment record documenting complaints of drowsiness, that plaintiff made no complaints of drowsiness to any physician who prescribed the methadone, or by observing that whatever drowsiness plaintiff may have experienced, it did not prevent her from driving a car, but the ALJ did not do so.   I do not recommend that this portion of the ALJ's opinion be vacated based on the strength of plaintiff's proof of disability, but rather on the ALJ's lack of analysis and Sixth Circuit decisions recognizing a procedural right to "good reasons" for the weight given to a treating physician's opinion independent of the claimant's substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d at 875-76.

## 2.

Plaintiff argues that the ALJ violated regulations for the assessment of subjective symptoms when he made his factual finding regarding plaintiff's credibility.   (Plf. Brief at 17-21; Reply Brief at 2-5).   Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ.   *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).   The court does not make its own credibility determinations.   *See Walters v. Commissioner*, 127 F.3d at 528.   The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005).   The Commissioner's determination

-16-

regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005); *see Ritchie v. Commissioner*, 540 F. App'x 508, 511 (6th Cir. 2013) ("We have held that an administrative law judge's credibility findings are 'virtually unchallengeable.'"). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

The Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable." *Rogers v. Commissioner*, 486 F.3d 234, 248 (6th Cir. 2007). The *Rogers* court observed that Social Security Ruling 96-7p requires that the ALJ explain his credibility determination and that the explanation "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248.

Plaintiff testified that she experienced drowsiness from methadone and that drowsiness was the biggest problem preventing her from working. (A.R. 60, 63). The ALJ's opinion simply noted plaintiff's testimony that she suffered drowsiness as a side effect of narcotic

-17-

medication, but he never explained why he found that plaintiff's testimony claiming that she

suffered from disabling drowsiness from methadone was not credible:

> The claimant is a 35-year-old woman, and she was 31 years old at the time of the amended alleged onset date. The claimant alleged that she is unable to work due to back pain, which limits her activity during the day (Cl. Testimony). She also testified that she takes narcotic medication to control her pain; however, this medication makes her drowsy during the day and further reduces her functionality (*Id.*). After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.

> * * *

> Overall, the treatment record shows that the claimant's medical providers chose conservative treatment to manage the claimant's back pain and there is no indication that the claimant is a possible candidate for back surgery. The treatment record simply does not confirm the existence of disabling back pain.

> * * *

> Overall, the undersigned finds the claimant's allegations of disability less than fully credible. The evidence shows only mild to moderate degenerative changes of the claimant's lumbar spine. She still has a good range of motion and is able to ambulate normally (1F, 2F, 3F, and 4F). The evidence does not confirm the disabling pain as alleged by the claimant. The claimant's allegations are inconsistent with her admitted ability to perform aerobics and be an active bowler (2F/3, 3F, and Cl. Testimony). The claimant testified that she is no longer able to bowl; however, the medical evidence does not show any further degeneration of the claimant's condition th[a]n when she was able to bowl. The claimant alleges disability here commencing on May 1, 2008 (amended alleged onset date) and testified as of that date she was limited in her ability to do most physical activities. However, she testified that 2010 was the first year she did not bowl. In 2008 and 2009 she was an active member of "several" bowling leagues and that was a year or two after she alleges she was first disabled. She is able to pick up her 35 to 40-pound daughter on occasion.

> The claimant's allegations of disabling symptoms and pain were all considered in the light most favorable to the claimant. Taking into account these allegations and the diagnostic findings set forth above, the undersigned reflected limitations, as appropriate in the residual functional capacity (SSRs 96-3p; 96-4p; 97-7p). The undersigned notes that, as stated above, the claimant's residual functional capacity is not based upon the claimant being pain-free, but rather is based on her ability to do work activities on a sustained basis despite limitations, such as pain, from her impairments.

(A.R. 24-27).  While the ALJ generally gave an adequate explanation why he found that plaintiff's testimony was not credible, he did not do so for her complaints of methadone-induced drowsiness. The ALJ could have easily noted that plaintiff never complained of the side effect of drowsiness to a physician who was actually prescribed this medication, or that if the side effect of drowsiness was as bad as plaintiff now claims, it would be reasonable to expect that a treating physician would explore alternative medications in search medication that would provide pain relief without the adverse side effect, but the ALJ did not do so.  Again, the recommendation that a portion of the ALJ's decision be vacated is not based on the basis of the strength of plaintiff's proofs, but rather the lack of analysis sufficient to satisfy Sixth Circuit standards.  *See Rogers*, 486 F.3d at 248.

### Recommended Disposition

For the reasons set forth herein,  I recommend that the Commissioner's decision be be affirmed in part and vacated in part.  I recommend that the portion of the ALJ's decision finding that plaintiff was not disabled through August 22, 2009, be affirmed.  I recommend that the portion of the ALJ's decision finding that plaintiff was not disabled during the period from August 23, 2009, through December 29, 2011, be vacated, and that the vacated portion be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

Dated:  October 10, 2014           /s/  Phillip J. Green
                                   United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All

objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).